Certiorari Denied, October 7, 2010, No. 32,593

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2010-NMCA-102

Filing Date: August 10, 2010

Docket No. 28,960

**NATIONAL UNION OF HOSPITAL
AND HEALTH CARE EMPLOYEES
DISTRICT NO. 1199 NEW MEXICO,
AFL-CIO, CLC,**

　　　**Plaintiff-Appellant,**

**v.**

**THE BOARD OF REGENTS OF
THE UNIVERSITY OF NEW
MEXICO, contracting with
Plaintiff as University Hospital,**

　　　**Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Linda M. Vanzi, District Judge**

Youtz & Valdez, P.C.
Shane Youtz
Albuquerque, NM

for Appellant

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Thomas L. Stahl
Edward Ricco
Jocelyn Drennan
Albuquerque, NM

for Appellee

**OPINION**

1

**SUTIN, Judge.**

**{1}** This case arose from a public sector collective bargaining impasse arbitration proceeding under the New Mexico Public Employee Bargaining Act (PEBA), NMSA 1978, §§ 10-7E-1 to -26 (2003, as amended through 2005), and a resolution called the University of New Mexico Labor Management Relations Resolution, Section 15, Negotiations and Impasse Resolution (the LMRR). The parties are National Union of Hospital and Health Care Employees District No. 1199 New Mexico, AFL-CIO, CLC (the Union) and the Board of Regents of the University of New Mexico (the University) acting for its hospital (the Hospital).

**{2}** The arbitration award favored the Union, and the Union sued to confirm the award under the New Mexico Uniform Arbitration Act, NMSA 1978, §§ 44-7A-1 to -32 (2001). The Hospital sought to vacate the award claiming that the arbitrator lacked jurisdiction to enter it and either engaged in misconduct or exceeded his authority in conducting the impasse arbitration. The Hospital also claimed that an employee bonus contained in the award would require the Hospital to violate public policy. The district court vacated the award and denied the Union's motion for reconsideration, and the Union brought this appeal. We affirm the district court's order, judgment, and decree vacating the award and determining it to be of no further effect.

## BACKGROUND

### The Parties' Negotiation and Mediation

**{3}** The parties engaged in negotiations to reach a new collective bargaining agreement when their existing one neared expiration in April 2007. The negotiations were conducted pursuant to the LMRR, which was a resolution promulgated by the University consistent with the PEBA and governing labor relations between the Hospital and its employees. *See* § 10-7E-26(B) (authorizing a public employer to adopt a resolution to govern collective bargaining); LMRR § 15(A), (B). The parties arrived at an impasse and, pursuant to the PEBA and the LMRR, they engaged in mediation. Section 10-7E-18(B)(1); LMRR § 15(C)(1). The Union made its last offer in mediation on October 18, 2007. The Hospital responded with a counterproposal on October 25, 2007. When the Union did not respond, the Hospital on November 6, 2007, made what it apparently labeled its "last, best and final offer," which was substantively the same as its October 25, 2007, offer. The mediation ended without the parties reaching agreement, which moved the parties to impasse arbitration.

### Final-Offer, Binding Arbitration Under the PEBA and the LMRR

**{4}** The PEBA requires final, binding arbitration as an impasse procedure for public employers and employee representatives whose impasse in negotiations cannot be

2

successfully resolved through mediation. Section 10-7E-18(B)(2); *Int'l Ass'n of Firefighters, Local 1687 v. City of Carlsbad*, 2009-NMCA-097, ¶ 1, 147 N.M. 6, 216 P.3d 256, *cert. denied*, 2009-NMCERT-007, 147 N.M. 363, 223 P.3d 360; *City of Deming v. Deming Firefighters Local 4521*, 2007-NMCA-069, ¶ 22, 141 N.M. 686, 160 P.3d 595. The PEBA provides for arbitration "if the impasse continues after a thirty-day mediation period." Section 10-7E-18(B)(2). Similarly, the LMRR provides for arbitration "if the impasse continues after thirty . . . calendar days." LMRR § 15(C)(2).

**{5}** The PEBA and the LMRR require the arbitrator to render a final, binding, written decision resolving unresolved issues no later than thirty days after notification to the arbitrator of his selection by the parties. Section 10-7E-18(B)(2); LMRR § 15(C)(2). Arbitrator Paul Gerhart was notified by letter dated November 7, 2007, of his selection. The PEBA and the LMRR state that "[t]he arbitrator's decision shall be limited to a selection of one of the two parties' complete, last, best offer." Section 10-7E-18(B)(2); LMRR § 15(C)(2).

**{6}** The foregoing impasse-arbitration procedure is known as final-offer package arbitration, pursuant to which the arbitrator is required to select an offer in its entirety and cannot decide particular matters on an issue-by-issue basis. We will refer to the public-sector-interest impasse and final-offer, binding arbitration process described in this part of the opinion as final-offer arbitration.

**The Purpose of Final-Offer Arbitration**

**{7}** The parties, the Hospital a good deal more than the Union, present discussion from or otherwise reference articles written on the background and purpose of final-offer arbitration.[1] The public-sector-arbitration process is characterized as "interest arbitration"

---

[1] *See* Charles W. Adams, *Final Offer Arbitration: Time for Serious Consideration by the Courts*, 66 Neb. L. Rev. 213 (1987); Arvid Anderson & Loren A. Krause, *Interest Arbitration: The Alternative to the Strike*, 56 Fordham L. Rev. 153 (1987); Charles B. Craver, *Public Sector Impasse Resolution Procedures*, 60 Chi.-Kent L. Rev. 779 (1984); Charles B. Craver, *The Judicial Enforcement of Public Sector Interest Arbitration*, 21 B.C. L. Rev. 557 (1980); Peter Feuille, *Final Offer Arbitration and Negotiating Incentives*, 32 Arb. J. 203 (1977); Peter Feuille, *Final Offer Arbitration and the Chilling Effect*, 14 Indus. Rel. 302 (Oct. 1975) [hereinafter Feuille II]; Paul F. Gerhart & John E. Drotning, *Do Uncertain Cost/Benefit Estimates Prolong Public-Sector Disputes?*, 103 Monthly Lab. Rev. 26 (1980); John E. Higgins, Jr., *The Developing Labor Law* (5th ed. 2006); Ronald Hoh, *Public Law: Interest Arbitration: Its Effects on Collective Bargaining in Montana's Protective Services*, 32 Mont. Lawyer 8 (2007); Richard C. Kearney & David G. Carnevale, *Labor Relations in the Public Sector*, 222 (3d ed. 2001); Gary Long & Peter Feuille, *Final-Offer Arbitration: "Sudden Death" in Eugene*, 27 Indus. & Lab. Rel. Rev. 186 (1974); Harold Newman, *Interest Arbitration: Impressions of a PERB Chairman*, 37 Arb. J. 7 (Dec.

in that it involves establishment of the terms and conditions that govern the parties' relationship during the life of their employment agreement. Anderson & Krause, *supra*, at 153; Craver, *The Judicial Enforcement of Public Sector Interest Arbitration*, *supra*, at 558, 571. Interest arbitration is the type of arbitration used "in the resolution of a contract negotiations dispute," as opposed to "rights' arbitration," which is the type used for the resolution of grievances. *W. Des Moines Educ. Ass'n v. Pub. Employment Relations Bd.*, 266 N.W.2d 118, 119 (Iowa 1978). "Interest arbitration itself is of two basic types. Final[-]offer arbitration or conventional arbitration." *Id.* (internal quotation marks and citation omitted). Final-offer arbitration laws developed as an alternative to or substitute for strikes in the public sector. Feuille II, *supra*, at 302-05; Hoh, *supra*, at 8. The parties submit their last, best offer to an arbitrator who is charged with selecting either a package or certain positions on an issue-by-issue basis. Feuille II, *supra*, at 304-05; Hoh, *supra*, at 9; *see W. Des Moines Educ. Ass'n*, 266 N.W.2d at 119.

**{8}** Final-offer arbitration came about in order to foster negotiation between the parties in a way that conventional arbitration did not. Feuille II, *supra*, 303-05; Hoh, *supra*, at 9-10, 40. It was a work-stoppage substitute in the public sector to provide needed incentive and stimulus for the parties to negotiate their way to agreement. Anderson & Krause, *supra*, at 156; Zack, *supra*, at 568-69. In final-offer arbitration, the parties are to understand that it is in their best interest to seriously and meaningfully negotiate in good faith and to narrow their differences to a point that reflects their best and final offers before the arbitrator selects one offer over the other; this process theoretically gives each party the best chance of winning the award and helps alleviate the concern, if not fear, that the arbitrator will select the other side's last offer. Feuille II, *supra*, at 304-05; Hoh, *supra*, at 40; Weitzman & Stochaj, *supra*, at 25. It was thought that conventional arbitration had a chilling effect on the negotiation process in that, in conventional arbitration, arbitrators often engaged in compromise, causing the parties to take extreme positions and avoid concessions. Adams, *supra*, at 215; Feuille II, *supra*, at 304; Hoh, *supra*, at 40; *see W. Des Moines Educ. Ass'n*, 266 N.W.2d at 119.

**The Final-Offer Arbitration in This Case**

---

1982); S. Barry Paisner & Michelle R. Haubert-Barela, *Correcting the Imbalance: The New Mexico Public Employee Bargaining Act and the Statutory Rights Provided to Public Employees*, 37 N.M. L. Rev. 357 (2007); Steven B. Rynecki & Thomas Gausden, *Current Trends in Public Sector Impasse Resolution*, 49 St. Gov't 273 (Autumn 1976); James L. Stern et al., *Final-Offer Arbitration* (1975); Carl M. Stevens, *Is Compulsory Arbitration Compatible with Bargaining?*, 5 Indus. Rel. 38 (Feb. 1966); Joan Weitzman & John M. Stochaj, *Attitudes of Arbitrators Toward Final-Offer Arbitration in New Jersey*, 35 Arb. J. 25 (March 1980); Arnold M. Zack, *Final Offer Selection—Panacea or Pandora's Box?*, 19 N.Y.L.F. 567 (1974).

**{9}** By mutual agreement of the parties, the final-offer arbitration hearing took place on December 12-13, 2007. At the close of business on December 11, and at the hearing on December 12, the Union made an offer dated December 10, 2007, that revised its October 18, 2007, offer. The Hospital objected to this offer on the ground that the Union could not substitute a new offer in place of its earlier, last, best offer. The Hospital reasoned that impasse ended at the point the Union made its revised offer on the eve of the arbitration hearing, and therefore the parties should be deemed to have returned to the negotiating table and, as a corollary, that the arbitrator was without jurisdiction to proceed; and that, alternatively, if the arbitration was to proceed, the arbitrator was required to choose between the earlier offers of October 18, and November 6, 2007.

**{10}** The arbitrator ruled that the LMRR did not preclude the Union from submitting a last, best offer at any time. He noted in his award that the Hospital "continued with the hearing only 'under protest.'" The arbitrator heard witnesses and received evidence in support of the parties' positions. In his award, the arbitrator addressed his discussions with the parties concerning the proceedings as follows.

> With respect to the substantive issues in dispute, both parties examined witnesses and presented other evidence in support of their respective positions. Witnesses were not sworn but were separated. At the conclusion of the presentation of evidence on December 13, the arbitrator met with counsel to discuss his preliminary view of the merits of their positions on all of the dozen or so issues in dispute. He urged the parties to reconsider their positions in light of his comments and to meet and confer themselves, and with their clients, in an effort to narrow, or completely resolve the issues. Subject to the [Hospital's] continuing objection to allow any modification of [the last, best offers], the parties agreed to submit revised [last, best offers] to the arbitrator on January 4, 2008, if they had not reached agreement by that time, and to follow such offers with their final post-hearing briefs on January 11. Briefs were timely received from both parties electronically on January 11. Although there were two subsequent conference calls (on January 15 and 17) involving counsel and the arbitrator regarding possible further modifications to the [last, best offers], the parties subsequently agreed, and informed the arbitrator on January 18, that their last[,] best offers of January 4 should be the basis for the arbitrator's decision, again, subject to the [Hospital's] continuing objection. Thus, the record was effectively closed with the receipt of the parties' January 11 briefs.

**{11}** In an affidavit of associate University counsel who represented the Hospital in the impasse arbitration hearing, filed in the district court proceeding by the Hospital, the Hospital describes the proceedings as follows.

5

14. Early in the hearing, the arbitrator asked that the parties confer off the record in an effort to narrow the issues, i.e., to bridge the gap between their respective offers (which at that time were the Union's December 10 offer and [the Hospital's] November 10 offer).

15. The arbitrator permitted the Union to further modify its offer several times during the hearing, including reducing its monetary demands and eliminating items which [the Hospital] maintained were illegal and rendered the Union's package legally unacceptable.

16. Throughout the arbitration proceeding, [the Hospital] preserved and renewed its objections to the arbitrator's permitting any modified offers, and made its objections part of the record. In light of the arbitrator's permitting modification, [the Hospital] did propose [a] non-material change to the language of its own offer, but expressly noted its objection to the arbitrator's permitting same and indicated that it was not waiving that objection.

17. Before concluding the hearing on December 12, the arbitrator announced on the record that he was leaving the record open for submission by each party of yet another modified offer.

18. Upon conclusion of the hearing on December 12, Arbitrator Gerhart asked to meet with the parties' counsel of record. That meeting lasted for nearly an hour, during which time Mr. Gerhart announced his impressions of the parties' respective positions (as of the close of the hearing) on each remaining disputed item. In addition to indicating whose position he was inclined to adopt, and describing his reasoning, on many of the disputed items, Mr. Gerhart advised the parties regarding how he would view modified offers on some of those items. The items on which he suggested modification that would be more to his liking included economic demands as well as non-economic items. Mr. Gerhart then directed the parties to simultaneously submit modified offers to him (and to each other) on January 4, 2008, and set January 11, 2008[,] as the date for submission of written closing arguments.

{12} According to the affidavit of the Hospital's counsel, the arbitrator then directed the parties to submit modified offers on January 4, 2008, and written final arguments on January 11, 2008. The Hospital's January 4 offer was submitted subject to and without waiving its objection to new offers or offers that modified the offers of October 18, 2007, and November 6, 2007.

{13} Also according to the Hospital's counsel, after the written final arguments were submitted to the arbitrator, the arbitrator again consulted with the parties' attorneys, advised

6

the attorneys of his views on the merits of their client's positions, made specific recommendations as to reasonable modifications, and gave additional time for the parties to make further modifications. Following that, the arbitrator apparently again consulted with the attorneys and obtained further modifications, still under the Hospital's protest; the parties indicated that they could go no further to resolve differences, and the arbitrator gave the parties a choice between their offers submitted on January 4 or their offers as modified up to the date of this last consult, which was January 17, 2008. We do not see where the Union challenges the Hospital's characterization of the proceedings.

**{14}** Based on the responses of the parties, the arbitrator made his decision from the parties' January 4, 2008, offers. The arbitrator issued a fifty-page opinion and award on February 1, 2008. The arbitrator set out his legal analyses supporting his view of how the final-offer arbitration was properly conducted. He also set out his analyses underlying his resolution of unresolved issues. The arbitrator interpreted the LMRR to require him to select "from the two last, best offers that are before him at the time he makes a decision." He selected the Union's January 4, 2008, offer as the more reasonable successor to the expiring labor agreement. His award stated, "[h]aving carefully considered all evidence submitted . . . as well as all relevant statutory criteria[,] . . . the arbitrator adopts the last[-]best offer total package of the Union." The Hospital attacked the arbitrator's opinion and award in the district court.

**{15}** Among the unresolved issues in the Union's offered package was a wage-related bonus for members of the bargaining unit that read as follows: "Upon ratification of the contract all bargaining unit members shall receive a ratification bonus in the amount of $500 to be paid by the first pay period after the ratification has taken place." The arbitrator construed this bonus provision as providing for "a lump sum to members of the bargaining unit effectively on the date of the arbitrator's award." The Hospital also attacked this determination in the district court on the grounds it would require the Hospital to violate the New Mexico Constitution as well as a criminal statute, and thereby violate public policy.

**{16}** The arbitrator described the Union's purpose of the bonus to be "to reinforce its commitment to making sure that low wage earners receive an increase to raise them out of the near poverty wages currently being paid by the University." The arbitrator boiled the issue down to one of fairness, asking, "Is it fair to deny employees a small bonus who have been denied wage increases for more than seven months?" The arbitrator noted that, in connection with the expected new agreement, the Union had appropriated funds for the bonus and that it would be inequitable and punitive to deny the bonus because of the "*mutual* inability of the parties to reach an agreement earlier."

**The District Court's Determinations and the Points on Appeal**

**{17}** The district court held that "the arbitrator lacked jurisdiction to hear the matter because the parties were not at impasse at the time of the arbitration." The court also determined that "the arbitrator engaged in misconduct that prejudiced the rights of [the

7

Hospital] and exceeded his authority by acting as a coercive mediator during the arbitration." The court further determined that the arbitration award was void as against public policy because the bonus payment would violate Article IV, Section 27 and Article IX, Section 14 of the New Mexico Constitution. On appeal, the Union asserts that the district court's denial of confirmation of the arbitrator's award misinterpreted and is inconsistent with the PEBA and the LMRR, and the court's determinations are contrary to the authority granted to an impasse arbitrator by the PEBA. The Union also asserts that the district court's determination relating to the ratification bonus was erroneous because the bonus does not violate public policy.

## DISCUSSION

### I.        The Arbitrator's Authority and His Conduct of Impasse Arbitration

**Standard of Review**

{18}    No facts are in dispute; the issues raised by the Union are issues of law. We review the issues de novo. *Cooper v. Chevron U.S.A., Inc.*, 2002-NMSC-020, ¶ 16, 132 N.M. 382, 49 P.3d 61; *State v. Ogden*, 118 N.M. 234, 240, 880 P.2d 845, 851 (1994); *Town of Silver City v. Garcia*, 115 N.M. 628, 632, 857 P.2d 28, 32 (1993).

**The Parties' Arguments**

{19}    The Union agrees with the arbitrator's view that LMRR Section 15(C) does not state or require that each party's last, best offer is frozen at the mediation phase of impasse resolution. The Union points out that some states do not permit a change in final offers made before arbitration, while others do, and that the New Mexico Legislature in the PEBA did not specify which system it preferred. The Union argues that the Legislature did not intend to set specific limitations on the timing of written, final offers because, had it intended to do so, it would have modeled the PEBA on other state statutes that contained a specific limitation. Although in its reply brief, the Union seems to relegate policy to a position second to its arguments on the language of the PEBA and the LMRR and on statutory construction (arguing plain language and ordinary meaning), the Union also argues that the arbitrator must be able to "express his opinion on various aspects of the offers and thus encourage parties to narrow the scope of disputed issues and insure that their respective last, best offers contain as few objectionable or offensive provisions as possible." Further, the Union argues that the arbitrator is to "force[] parties to critically evaluate their own last, best offers based upon the testimony actually offered in the arbitration and encourage[] modifications by both parties to increase the likelihood of a settlement short of an arbitrator's decision and to avoid the sometimes anomalous results of final-offer package arbitration."

{20}    In the Union's view, the more reasonable interpretation of the LMRR is that "once thirty days have passed and mediation has not resolved the impasse . . . the arbitration

8

process begins and the timing of the . . . 'last, best offers' is left to the discretion of the arbitrator." The Union discusses several rules of statutory construction to support this position in order to derive an intent to "allow for an evolving identification of issues." The Union reduces the Hospital's positions as solely policy-based, as opposed to intent-based.

**{21}** The Hospital argues that legislative history, the language of the PEBA and the LMRR, the intent of the Legislature, and the rationale underlying final-offer arbitration, all support the district court's decision to vacate the award on grounds of misconduct and lack of authority. In the Hospital's view, to encourage and allow modification of pre-arbitration final offers after mediation fails and during arbitration violates the essential purpose of final-offer arbitration.

**The Scope of the Final-Offer Arbitration in the PEBA and the LMRR**

**{22}** We confine our analysis and discussion in this case to whether the arbitrator exceeded his authority under the PEBA and the LMRR in his conduct of the final-offer arbitration or whether the arbitrator engaged in misconduct under Section 44-7A-24(a)(4) of the Uniform Arbitration Act. Because we hold that the arbitrator exceeded his authority and engaged in misconduct, we see no need to address whether the arbitrator acted without jurisdiction.

**{23}** We endeavor to interpret the PEBA and the LMRR using established principles of statutory construction. We are to determine and effectuate the intent of the Legislature. *Key v. Chrysler Motors Corp.*, 121 N.M. 764, 768-69, 918 P.2d 350, 354-55 (1996). We read a legislative act in its entirety toward reaching a harmonious and consistent enactment as a whole. *Id.* at 769, 918 P.2d at 355. Thus, all provisions of the act will be considered in relation to one another, with the attempt to render no part surplusage or superfluous. *Regents of Univ. of N.M. v. N.M. Fed'n of Teachers*, 1998-NMSC-020, ¶ 28, 125 N.M. 401, 962 P.2d 1236. We attempt "to determine legislative intent primarily from the legislation itself," and "[w]e will not depart from the plain wording of a statute, unless it is necessary to resolve an ambiguity, correct a mistake or an absurdity that the Legislature could not have intended, or to deal with an irreconcilable conflict among statutory provisions." *Id.* ¶¶ 28, 30. Further, "we exercise caution in applying the plain meaning rule," for it "must yield on occasion to an intention otherwise discerned in terms of equity, legislative history, or other sources." *State v. Smith*, 2004-NMSC-032, ¶ 9, 136 N.M. 372, 98 P.3d 1022 (internal quotation marks and citation omitted). When the policy of the Legislature is unclear or a statute is ambiguous in that regard, "we may . . . consider the policy implications of the various constructions of the statute." *State v. Rivera*, 2004-NMSC-001, ¶ 14, 134 N.M. 768, 82 P.3d 939 (filed 2003). "Legislative silence is at best a tenuous guide to determining legislative intent." *Swink v. Fingado*, 115 N.M. 275, 283, 850 P.2d 978, 986 (1993). Confronted with legislative silence on a particular issue, we resort to other statutory construction aids, keeping in mind that our goal is to facilitate the operation of the act and any specified goals of the Legislature. *N.M. Dep't of Health v. Compton*, 2001-NMSC-032, ¶ 18, 131 N.M. 204, 34 P.3d 593.

9

**{24}** In the PEBA, the Legislature defined "collective bargaining" as meaning "the act of negotiating between a public employer and an exclusive representative for the purpose of entering into a written agreement." Section 10-7E-4(F). The public employer and the exclusive representative must "bargain in good faith," but "neither . . . shall be required to agree to a proposal or to make a concession[.]" Section 10-7E-17(A)(1). In discussing the act of negotiating, Section 10-7E-18(A)(1) to (3) refers to when negotiations are to begin and what occurs "if an impasse occurs during negotiations." The PEBA defines "impasse" as a failure of the parties, "after good-faith bargaining, to reach agreement in the course of negotiating a collective bargaining agreement[.]" Section 10-7E-4(K). Mediation occurs upon impasse "to assist in negotiations." Section 10-7E-18(A)(3). "'[M]ediation' means assistance by an impartial third party to resolve an impasse . . . through interpretation, suggestion and advice[.]" Section 10-7E-4(P). If impasse continues after a certain date by which the mediation must end, an arbitrator is to be selected. Section 10-7E-18(A)(5). The authority granted the arbitrator is to "render a final, binding, written decision resolving unresolved issues," which decision "shall be limited to a selection of one of the two parties' complete, last, best offer." Section 10-7E-18(B)(2). The provisions of the LMRR are not significantly different than those in the PEBA. *See* LMRR §§ 4(D), (L), (P), 15(A), (B), (C).

**{25}** Nothing in the PEBA or the LMRR mentions collective bargaining negotiations or the act of collective bargaining or negotiation during the arbitration process. Nothing mentions a role of the arbitrator as being similar in any respect to that of a mediator. Nothing indicates that collective bargaining negotiations may continue during arbitration or that the arbitrator has authority or is expected to assist in negotiations. Nothing expressly or impliedly grants the arbitrator authority to act in any manner other than as an arbitrator with the mandatory responsibility of selecting one package offer over another.

**{26}** The Union essentially argues that the silence in the PEBA and the LMRR as to an arbitrator's role up to the point of the arbitrator's selection of one party's offer indicates that the arbitrator has authority to act in the nature of a mediator until a final selection of various further offers made during the arbitration. The Union also points out that the failure in the PEBA and the LMRR to explicitly state that the final, last, best offers from which the arbitrator is to make his selection must be those made before his selection as arbitrator.

**{27}** We are not persuaded by the Union's arguments. We think it is reasonable to assume that the Legislature intended the processes of negotiation and mediation, and the process of arbitration, to be different. The PEBA and the LMRR give no indication of any intent that collective bargaining negotiations, including assistance in those negotiations by a third-party neutral mediator, are to take place as a part of the arbitration process. That the arbitrator is to resolve unresolved issues does not indicate anything to the contrary. As we read the PEBA and the LMRR, the resolution of unresolved issues is to be done in a "decision" and that decision is to be a final, binding, and written decision selecting one party's offered collective bargaining agreement—necessarily resolving unresolved issues. We do not see how the taking of testimony and other evidence, which is an inherent aspect of arbitration, *see, e.g.*, § 44-7A-16 (setting out the arbitration process), means that the arbitrator is to act

10

as a mediator or is to seek or obtain modified offers. We must assume that the purpose of taking testimony and other evidence is to assist the arbitrator in deciding which is the best of the two final, best offers made by the parties before the arbitrator was selected.

{28}    Further, the PEBA and the LMRR set out a sixty-day time restraint—a thirty-day mediation period and a thirty-day period for the arbitrator to render a decision. Section 10-7E-18(B)(1), (2); LMRR § 15(C)(2). Presumably, this restraint is considered purposeful and important in public sector collective bargaining and constitutes an attempt to assure that expiring collective bargaining agreements are quickly replaced with new ones. Presumably, the Legislature and the LMRR defined "impasse" as it did in order to set the stage for finality within a particular time frame through final-offer arbitration. The sense we get from the PEBA and the LMRR is that if mediation fails in its attempt within the time frame allotted to assist the parties in negotiations to overcome impasse and to arrive at an agreement, the job of the arbitrator is to bring impasse to a close within the time frame allotted by making a final, binding, written decision after considering whatever testimony and other evidence is needed for the determination of which of the parties' last, best, prior-to-impasse offer to select.

{29}    The governing provisions give no indication of any intent to relax the rationale underlying a final-offer arbitration, which is to push and require the parties to negotiate in good faith and to arrive at their final, best offers during the negotiation and bargaining process before having to face the stark reality and finality of impasse arbitration. Under the process employed by the arbitrator and supported by the Union, the arbitration process becomes but an extension of the bargaining, negotiation, and mediation processes. This is the antithesis of final-offer arbitration, in that what is likely to occur is that parties will withhold good faith movement to last, best offers during negotiations and mediation in order to change and enhance their bargaining position at arbitration, a tactic that "derogates the obligation to bargaining in good faith," Hoh, *supra*, at 41, and seems to effectively read "impasse" out of the PEBA and the LMRR.

{30}    We interpret the express requirement that the parties "bargain in good faith" to mean negotiate to a point, before an arbitrator is selected, at which time each side has made its last, best offer. At oral argument, the Union's counsel agreed with this interpretation. We fail to see how a party can bargain in good faith if that party does not intend its last offer before the arbitrator is selected to be its last, best offer, but instead intends after the arbitrator is selected to make modified offers that the arbitrator would have discretion to select as that party's last, best offer. The Union conceded in oral argument that it intended at the time the arbitrator was selected to make such a modified offer.

{31}    An arbitrator's award may be vacated under the Uniform Arbitration Act if the arbitrator exceeded his powers. Section 44-7A-24(a)(4). To be confirmed, an award must be "within the scope of the submission." *Fernandez v. Farmers Ins. Co. of Ariz.*, 115 N.M. 622, 625-26, 857 P.2d 22, 25-26 (1993). In the present case, we hold that the arbitrator exceeded his authority and powers under the PEBA and the LMRR by his conduct during

11

the arbitration and his failure to select the last, best offer of one of the two parties made before he was selected as arbitrator. In our view, the process chosen by the arbitrator in this case was a much different process than that intended by the Legislature under the PEBA and that contemplated under the LMRR. It appears that the present case embodies a tug-of-war between what some arbitrators and perhaps parties to labor contracts prefer and what final-offer arbitration is meant to encompass.

> The choice in final offer selection should be between total packages rather than issue by issue. Although it is true that a more equitable resolution might be achieved if the decisions were made on an issue by issue basis, and certainly the arbitrators would be more comfortable with this arrangement, it must be borne in mind that the sense of reasonableness on the part of the arbitrator and the achievement of the most equitable or desirable agreement, are not the primary purposes of final offer selection. Rather, the objective is independent settlement by the parties. The greater the risk to each party of submitting a final offer, the greater the likelihood of settlement. Each party must run the risk of its whole package being thrown out because of the unreasonableness or unacceptability of even one element therein. Only in that way can the greatest pressure be exerted on the parties for direct settlement. Indeed, to the extent that a whole package may be thrown out because of one element which is deemed objectionable by the arbitrator, . . . the prospect is improved for future voluntary settlements.

*W. Des Moines Educ. Ass'n*, 266 N.W.2d at 126 (internal quotation marks omitted) (quoting Zack, *supra*, at 578-79).

**{32}** By selecting a modified offer made during the arbitration process, the arbitrator undermined the purpose of final-offer arbitration. *See La Crosse Prof'l Police Ass'n v. City of La Crosse*, 568 N.W.2d 20, 24-25 (Wis. Ct. App. 1997) (determining that the arbitrator's modifications to a final offer undermined the purpose of final-offer arbitration, which was "to induce the parties to bargain in good faith to reach an agreement or at least to narrow the differences between the parties to the greatest extent possible" (internal quotation marks and citation omitted)). The manner in which the arbitrator conducted the arbitration was legally erroneous in that he misconstrued the essential final-offer arbitration process set out in the PEBA and the LMRR. That misapprehension of the law and process related directly to, directly affected, and manifestly exceeded the scope of the arbitrator's statutory and resolution authority. We hold that the arbitrator's unauthorized conduct of the final-offer arbitration required the award to be vacated under Section 44-7A-24(a)(4). We further hold that based on the same conduct, the award was properly vacated on the ground of misconduct under Section 44-7A-24(a)(2)(C).

**{33}** If our Legislature had wanted the sort of continued "last, best" offer process that the Union advances, surely after the various state laws on the books, cases decided, and scholarly articles written as of 2003, the Legislature would have placed different language

in its final-offer arbitration provisions. We think it is noteworthy that in enacting the present form of Section 10-7E-18(B) the Legislature changed from a mediation process with advisory fact finding to a process of first involving mediation to assist negotiations, then moving to binding, final-offer package arbitration. *See* NMSA 1978, § 10-7D-18(B) (repealed 1999); § 10-7E-18(B). We will assume that the Legislature was dissatisfied with the former process and thought it necessary to replace it with one that required the parties to understand the risks and consequences of not going the distance in negotiating seriously and in good faith, and one that intentionally cut off true impasse with rigid final-offer arbitration finality. *See State v. Shay*, 2004-NMCA-077, ¶ 7, 136 N.M. 8, 94 P.3d 8 ("By deliberately changing the statute . . . , the [L]egislature indicated its dissatisfaction with the old scheme and an intent to depart from that scheme.").

## II.     The Ratification Bonus

**{34}**     Although we affirm the district court's vacation of the award based on the arbitrator's having exceeded his authority under the PEBA and the LMRR, we think it necessary to also address whether the $500 bonus payable to each member of the bargaining unit violated public policy set out in Article IV, Section 27 and Article IX, Section 14 of the New Mexico Constitution. The district court held that the arbitration award was void because the bonus payment would violate public policy in that it would violate Article IV, Section 27 and Article IX, Section 14.

**{35}**     Article IV, Section 27 provides:

> No law shall be enacted giving any extra compensation to any public officer, servant, agent or contractor after services are rendered or contract made; nor shall the compensation of any officer be increased or diminished during his term of office, except as otherwise provided in this constitution.

Article IX, Section 14 referred to as the "anti-donation provision" provides:

> Neither the state nor any county, school district or municipality, except as otherwise provided in this constitution, shall directly or indirectly lend or pledge its credit or make any donation to or in aid of any person, association or public or private corporation, or in aid of any private enterprise for the construction of any railroad except as provided in Subsections A through F of this section.

The bonus issue is one of law, which we review de novo. *See State v. Isaac M.*, 2001-NMCA-088, ¶ 4, 131 N.M. 235, 34 P.3d 624; *Gabaldon v. Erisa Mortgage Co.*, 1997-NMCA-120, ¶ 7, 124 N.M. 296, 949 P.2d 1193, *aff'd in part, rev'd in part on other grounds*, 1999-NMSC-039, 128 N.M. 84, 990 P.2d 197.

13

**{36}** The Union argues that Article IV, Section 27 does not apply to the Hospital's employees because the constitutional provision applies to public officials who hold office for a term and does not apply to public employees who do not hold terms of office. *See Whitely v. N.M. State Pers. Bd.*, 115 N.M 308, 313, 850 P.2d 1011, 1016 (1993) (recognizing that the Court "held that the constitutional prohibition against diminishing an officer's compensation during his term in office does not apply to public employees who do not hold terms of office" (internal quotation marks and citation omitted)); *State ex rel. Gilbert v. Bd. of Comm'rs of Sierra County*, 29 N.M. 209, 214, 222 P. 654, 655 (1924) ("It has been many times held that [the anti-donation] provision does not apply to . . . employees . . . and others similarly situated. This is due to the fact that such persons have no 'term of office' within the intendment of such constitutional provision."). The Court in *Whitely* relied, and the Union relies, on the following language from *Gilbert*:

> [Article IV, Section 27] was designed to protect the individual officer against legislative oppression which might flow from party rancor, personal spleen, enmity, or grudge. These could well harass and cripple the officer by reducing his compensation during his service; while, on the other hand, party feeling, blood, or business relations might be combined in such pernicious activity in the form of strong and powerful lobbying as to sway the members of the Legislature and cause the bestowal of an unmerited increase. To obviate these conditions is the purpose of this wise constitutional provision.

*Gilbert*, 29 N.M. at 214, 222 P. at 655. We reject the Union's argument. The plain language of Article IV, Section 27 refers not only to public "officer," but also to public "servant," "agent," and "contractor." Further, we do not read the cases the Union cites as holding that the statute exclusively applies only to public officials who hold office for a term. Other cases in fact indicate the contrary. *See Whitely*, 115 N.M. at 309-10, 850 P.2d at 1012-13 (addressing accrual of annual vacation leave for juvenile probation officers and their staffs); *State ex rel. Sena v. Trujillo*, 46 N.M. 361, 363, 129 P.2d 329, 329-30 (1942) (addressing payment of a pension to the clerk of the Supreme Court).

**{37}** The Union also faults the district court's determination relating to Article IV, Section 27 on the ground that the bonus is a lump-sum amount that constitutes a part of contemplated compensation for services to be performed as part of the employee's total compensation package yet to be agreed upon. Thus, according to the Union, the bonus cannot be considered either extra compensation after a contract is already made or a retroactive pay increase for work already performed, which are the types of payments the Union argues are meant to be prohibited under the constitutional mandates. The Union points out that the existing agreement contains several forms of permissible bonuses to employees. Turning to Article IX, Section 14, the Union disputes the court's determination that the bonus would constitute a gift in violation of Article IX, Section 14, arguing that it is nonsensical to conclude that "the payment of wages for work performed" is a gift.

14

**{38}** The Union cites no authority in its brief in chief for its arguments. In its reply brief, the Union asserts that the Hospital's argument that the bonus is illegal because it violates the Article IX, Section 14 anti-donation provision is an argument similar to one rejected in *Treloar v. County of Chaves*, 2001-NMCA-074, 130 N.M. 794, 32 P.3d 803. In *Treloar*, this Court disagreed with the argument that a severance pay package contracted by a physician with a county-created hospital violated the anti-donation provision, stating that "severance pay is deemed to be in the nature of wages that have been earned. Thus, consideration had been given for the severance obligation, and there was no gift." *Id.* ¶ 32. The Union argues that "[b]onuses, like severance pay, are in the nature of wages that have been earned." The Union's primary defense to the Hospital's argument, however, is to dispute the application of the authorities relied on by the Hospital in the district court, which include opinions of the New Mexico Attorney General and two decisions of our Supreme Court. *See Vill. of Deming v. Hosdreg Co.*, 62 N.M. 18, 303 P.2d 920 (1956); *Sena*, 46 N.M. 361, 129 P.2d 329; N.M. Att'y Gen. Op. 88-66 (1988); N.M. Att'y Gen. Op. 72-44 (1972); N.M. Att'y Gen. Op. 71-07 (1971); N.M. Att'y Gen. Op. 57-17 (1957).

**{39}** The Hospital argues that the bonus would be a payment that the recipients would receive based on nothing more than simply being members of the bargaining unit when the new contract went into effect. According to the Hospital, the bonus did not represent compensation for any past or expected work, for any enhanced job qualification, or for any quality or longevity standard, and it therefore constituted forbidden extra and retroactive pay in violation of the public policy behind the constitutional provisions.

**{40}** The bonus provision in the arbitrator's award is completely silent as to what it is specifically for, but there appears to be little controversy over the actual purpose for the bonus. The arbitrator's award unmistakably indicates that the bonus would be to compensate bargaining unit members for the delay in implementing wage increases under a new agreement. As such, the bonus becomes a retroactive wage. We hold that Article IV, Section 27 and Article IX, Section 14 require the conclusion that payment of the bonus will violate public policy. The Union provides no authority to the contrary. We fail to see how work performed under the terms and conditions of the extension of the existing agreement can be properly compensated pursuant to the terms and conditions of the new agreement.

**CONCLUSION**

**{41}** We affirm the district court. We hold that the arbitrator exceeded his authority and also engaged in misconduct in the manner in which he conducted the arbitration. We further hold that the $500 bonus provision in the selected offer required the Hospital to violate public policy and it was therefore impermissible, invalidating the entire package.

**{42}   IT IS SO ORDERED.**

---
**JONATHAN B. SUTIN, Judge**

15

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**MICHAEL E. VIGIL, Judge**

**Topic Index for** _Nat'l Union of Hosp. Employees v. Bd. of Regents_**, Docket No. 28,960**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-AN | Anti-donation Clause |
| CT-NM | New Mexico Constitution, General |
| | |
| **EL** | **EMPLOYMENT LAW** |
| EL-CB | Collective Bargaining |
| EL-LU | Labor Unions |
| | |
| **EV** | **EVIDENCE** |
| EV-SS | Substantial or Sufficient Evidence |
| EV-SU | Suppression of Evidence |
| | |
| **GV** | **GOVERNMENT** |
| GV-PE | Public Employees |
| | |
| **RE** | **REMEDIES** |
| RE-AN | Arbitration |
| | |
| **ST** | **STATUTES** |
| ST-LI | Legislative Intent |