**Certiorari Granted, November 16, 2012, No. 33,792**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2012-NMCA-114**

**Filing Date: August 8, 2012**

**Docket No. 30,847**

**STATE OF NEW MEXICO,**

    **Plaintifff/Movant-Appellant,**

**v.**

**AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES COUNCIL 18,
AFL-CIO, CLC, and COMMUNICATION WORKERS
OF AMERICA, AFL-CIO, CLC,**

    **Defendants/Respondents-Appellees.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Alan M. Malott, District Judge**

Tinnin Law Firm, P.C.
Robert P. Tinnin, Jr.
Albuquerque, NM

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Thomas L. Stahl
Albuquerque, NM

for Appellant

Youtz & Valdez, P.C.
Shane Youtz
Marianne Bowers
Albuquerque, NM

for Appellees

**OPINION**

1

**FRY, Judge.**

**{1}** Appellees American Federation of State, County, and Municipal Employees, Council 18 (AFSCME) and Communication Workers of America (CWA) (collectively, the Unions) represent two groups of classified employees who work for the State of New Mexico. In fiscal year 2009 (FY2009), the State implemented salary increases for its classified employees that differed from those required by collective bargaining agreements previously executed by the State and the Unions. Each Union reacted by filing grievances that were ultimately submitted to arbitration for resolution. The arbitrators determined that the State's pay package for FY2009 violated the terms of the agreements and accordingly issued awards in favor of the Unions. The State appeals from the district court's confirmation of the arbitration awards, arguing that the district court employed an improper standard of review and that the arbitrators acted in excess of their authority. We affirm.

## BACKGROUND

### Terms of the Agreements

**{2}** In September 2005, AFSCME and CWA each entered into a collective bargaining agreement (collectively, the Agreements) with the State that covered, in relevant part, contractual salary increases for three fiscal years, ending in FY2009. This appeal specifically concerns two contractual salary increases for FY2009 required by the Agreements. The first of these contractual salary increases provided a two percent general salary increase subject to "the Governor's Recommendation" for employees in each Union's bargaining unit that was to be effective the first full pay period following July 1, 2008. The second salary increase was "[s]ubject to legislative appropriation" and was a compa-ratio based within-band salary increase that was to be effective the first full pay period following January 1, 2009. Both Agreements were identical with respect to these two contractual salary increase provisions. In addition, the Agreements provided that:

> In the event the salary increases described [above] are not implemented because the [L]egislature fails to appropriate sufficient funds in any fiscal year, the Union[s] ha[ve] the right to reopen bargaining over general salary and within band [salary] increases that would be effective for the fiscal year following the fiscal year in which the [L]egislature fails to appropriate sufficient funds[.]

The Agreements included grievance and arbitration provisions to be followed by the parties in the event of an alleged violation, misapplication, or misinterpretation of the Agreements.

**{3}** The Union-represented employees constituted a subset of all classified employees working for the State in FY2009. During the 2008 legislative session at issue in this case, it is undisputed that the Legislature would have needed to appropriate approximately $8 million to fund the two salary increases required by the Agreements—$5.8 million for

2

employees within the AFSCME bargaining unit and approximately $1.9 million for the CWA bargaining unit employees. By contrast, the Legislature would need to appropriate approximately $15.9 million dollars in order to extend the two salary increases provided for in the Agreements to *all* eligible classified employees—both unrepresented workers as well as Union-represented employees.

**Legislative Appropriations for FY2009**

{4}    The Legislature's appropriation bill for FY2009 appropriated $12,833,000 "to provide incumbents in agencies governed by the Personnel Act . . . with an *average* salary increase of two and four-tenths percent . . . based on employee job performance as determined by the personnel board." (Emphasis added.) This increase was to be effective July 1, 2008. A second bill passed by the Legislature provided "an additional *average* salary increase of one-half percent" to be effective on July 1, 2008, that was to be paid by each state agency using its "cash balances, vacancy savings[,] and other available funds." (Emphasis added.) This bill authorized the Department of Finance and Administration to distribute up to $500,000 of the appropriation contingency fund to those agencies that did not have available funds for the one-half percent salary increase.

{5}    Following the legislative session, the State Personnel Office (SPO) contacted representatives of the Unions and informed them that it believed the Legislature had not appropriated sufficient funds to cover the salary increases required by the Agreements. Two meetings were held between the Unions and SPO to discuss the legislative appropriations and the pay package that SPO was planning to recommend to the Personnel Board. At the conclusion of the second meeting, the Unions requested an additional meeting and an opportunity to present a counterproposal to SPO's planned recommendation. This request was denied, and the Personnel Board then approved and the State implemented a pay package for FY2009 that differed not only from the terms of the Agreements, but also from the pay package discussed by SPO and the Unions at the two meetings. The package that was implemented provided: "[a] salary increase of [two and four-tenths percent] of pay-band midpoint to incumbents in agencies governed by the Personnel Act" and "[a]n additional [one-half percent] of pay-band midpoint salary increase for incumbent employees subject to the Personnel Act." This flat two and nine-tenths percent salary increase was effective July 1, 2008, and applied to *all* classified employees, including unrepresented and Union-represented employees.

**Arbitration Proceedings**

{6}    Both AFSCME and CWA filed grievances with SPO following the implementation of the pay package for FY2009. The Unions' primary argument was that even if the funding appropriated by the Legislature was insufficient to give *all* classified employees the two salary increases contracted for under the Agreements, there were nonetheless sufficient funds appropriated to fully fund the increases for Union-represented employees and still provide an "average" of two and four-tenths percent and an additional "average" of one-half percent

3

in salary increases for all employees. The Unions also alleged that SPO had negotiated in bad faith by failing to give the Unions an opportunity to bargain over the pay package that was ultimately implemented by the State.

{7}    Unable to resolve their disputes through the grievance process, the State and the Unions submitted to arbitration. Arbitration between AFSCME and the State occurred on March 27, 2009, before arbitrator Alvin Goldman. On June 15, 2009, Goldman issued an opinion and award in favor of AFSCME. Goldman determined that the State had not violated the first salary increase requirement of the AFSCME Agreement—the two percent increase effective on July 1, 2008—because the pay plan implemented by the State for FY2009 provided an increase of two and nine-tenths percent on July 1, 2008. However, he determined that the State failed to provide the compa-ratio increases required by the AFSCME Agreement and, therefore, the total "received wage increases for bargaining unit employees were less than would have been received had the pay [package] conformed" with the requirements of the AFSCME Agreement. Goldman concluded that the $12.5 million dollars appropriated by the Legislature was "more than enough" to meet the State's obligation to pay the AFSCME Agreement increases to Union-represented employees and "still permit smaller increases for non bargaining unit personnel."

{8}    In terms of the award, Goldman directed the State to calculate what the salary levels would have been for AFSCME-represented employees had they received the salary increases contemplated by the AFSCME Agreement and, if permitted by FY2010 allocations, to adjust the FY2010 salary levels to reflect the level they would have been had the salary increases been provided. In addition, the award directed that "bargaining unit employees shall be paid the difference between what they were paid in [FY]2009 and what they would have been paid had their pay been raised by" the two salary increases required by the AFSCME Agreement.

{9}    Arbitration between CWA and the State took place at a hearing on May 6, 2009, before arbitrator John Criswell, during which the parties submitted evidence and presented testimony. On September 25, 2009, Criswell issued what he termed an "interim award" in favor of CWA. He concluded that there was "undisputed evidence" demonstrating that the Legislature appropriated sufficient funds for the salary increases required by the CWA Agreement and, thus, the State improperly failed to pay the salary increases. Like Goldman in the AFSCME arbitration, Criswell determined that the language of the legislative appropriation bills required only that the salary increases received by all classified employees total an "average" of two and nine-tenths percent and that there was no evidence presented by the State that it "was impossible to comply with this requirement by granting the [Union-]represented employees their legally required salary increase[s]" under the terms of the CWA Agreement "while providing a lesser increase to [an] unrepresented employee[]." Criswell concluded that there was no evidence presented that the State "owed any legal obligation to pay to the unrepresented employees the same salary increases that the [CWA Agreement] called for."

4

**{10}** After finding in favor of CWA, Criswell expressed his uncertainty as to the possible remedies available to make the CWA-represented employees whole. He therefore indicated that the award was of an interim nature and that he would retain jurisdiction until: (1) the State provided CWA with a list of employees who should have received the two salary increases required by the CWA Agreement along with the amounts of the increases for each employee; and (2) the parties attempted to agree on a "proper, legal method" which could permit payment of the two salary increases to the employees.

**District Court's Review of the Arbitration Awards**

**{11}** The State filed a motion in district court seeking judicial review of the arbitration awards pursuant to the Uniform Arbitration Act (UAA), NMSA 1978, Sections 44-7A-1 to -32 (2001). The Unions filed cross-motions seeking confirmation of the awards. After consolidating the individual cases involving each Union, the district court confirmed the arbitration awards. The district court found that while it "may or may not have reached the same conclusions as the [a]rbitrators, the [c]ourt d[id] not find the decisions of the [a]rbitrators in each of these cases to have been so 'palpably mistaken,' so 'completely irrational,' or so violative of public policy as to warrant the [c]ourt's substitution of its interpretation and conclusions for that of the duly chosen arbitrators who had the benefit of first hand review of the testimony and the subject matter expertise of an experienced arbitrator." This appeal followed.

**DISCUSSION**

**{12}** The State raises four issues on appeal that it contends require reversal of the district court's confirmation of the AFSCME and CWA arbitration awards. As a preliminary matter, the State contends that the district court applied an improper standard of review in the proceedings below. The State also challenges substantive aspects of the arbitration awards, arguing that the awards must be vacated because the arbitrators exceeded their powers under the UAA by: (1) committing "gross error of fact or law" in determining that the Legislature appropriated sufficient funds to cover the Agreement salary increases and (2) mandating remedies that violate provisions of the Public Employee Bargaining Act (PEBA), NMSA 1978, §§ 10-7E-1 to -26 (2003, as amended through 2005), and the New Mexico Constitution. *See* § 44-7A-24(a)(4) (providing that a district court "shall vacate an award made in the arbitration proceeding" if the arbitrator exceeded his/her powers).

**I.      District Court's Review of the Arbitration Awards**

**{13}** The State initially argues that the district court applied an erroneous standard of review under Section 44-7A-24(a)(4) in determining whether to confirm or vacate the arbitration awards. The district court relied on *Fernandez v. Farmers Ins. Co. of Arizona*, 115 N.M. 622, 857 P.2d 22 (1993), for the applicable standard of review. In *Fernandez*, our Supreme Court emphasized that the UAA "controls the scope of the district court's review of an arbitration award" and that such review is generally limited to allegations that the

5

award was the result of "fraud, partiality, misconduct, excess of powers, or technical problems in the execution of the award." 115 N.M. at 625, 857 P.2d at 25. The UAA neither empowers the district court to review an arbitration award on the merits of the controversy nor grants the district court the authority to review an award for errors of law or fact. *Id.* at 626, 857 P.2d at 26.

**{14}** The State maintains that the district court should have conducted an independent review of the arbitration records prior to determining whether the arbitrators exceeded their powers. This view is contrary to our case law, including *Fernandez*, which holds that a district court's review of an arbitration award is limited in scope and does not permit de novo review. Our Supreme Court noted in *In re Arbitration Between Town of Silver City and Silver City Police Officers Ass'n* that judicial review of arbitration awards is strictly limited and that "[d]e novo review of the merits of arbitration awards by the district court would only serve to frustrate the purpose of arbitration, which seeks to further judicial economy by providing a quick, informal, and less costly alternative to judicial resolution of disputes." 115 N.M. 628, 632, 857 P.2d 28, 32 (1993). The district court is not to apply de novo review and "should simply conduct an evidentiary hearing and enter findings of fact and conclusions of law" with respect to each statutory basis raised as a ground for vacating or modifying the award. *Id.* at 631-32, 857 P.2d at 31-32 (internal quotation marks and citation omitted). Thus, the district court determines, based on the evidence presented to it, whether the award was the result of "fraud, partiality, misconduct, excess of powers, or technical problems in the execution of the award." *Fernandez*, 115 N.M. at 625, 857 P.2d at 25.

**{15}** We conclude that the standard advocated by the State is a de novo standard that our case law has firmly rejected. In contrast, the review applied by the district court was consistent with the standard established by our jurisprudence. In the district court, the parties requested a hearing, filed several written pleadings in support of their arguments, and submitted the arbitration records and exhibits. The district court's final order stated that the court held a hearing on the matter, reviewed the parties' briefs and the arbitration decisions prior to reaching its decision, and concluded that there was no ground for vacating the award.

**{16}** The State further argues that the district court's reliance on *Fernandez* for the applicable standard of review was incorrect because *Fernandez* does not articulate a standard governing judicial review of arbitration awards under Section 44-7A-24(a)(4). We are not persuaded for two reasons. First, the State itself relied on *Fernandez* as the appropriate standard of review for the district court in its initial motion seeking vacatur of the arbitration awards and in its response brief to the Unions' cross-motions for confirmation of the awards. *See Cordova v. Taos Ski Valley, Inc.*, 1996-NMCA-009, 121 N.M. 258, 263, 910 P.2d 334, 339 (explaining that "[a] party who has contributed, at least in part, to perceived shortcomings in a trial court's ruling should hardly be heard to complain about those shortcomings on appeal").

6

**{17}** Second, the district court's reliance on *Fernandez* was not improper. Although *Fernandez* was decided under a prior version of the UAA, the basis for vacating an award due to an arbitrator exceeding his or her powers is the same in both the current and the previous versions of the UAA. *Compare* NMSA 1978, § 44-7-12(A)(3) (1971) (repealed 2001), *with* § 44-7A-24(a)(4). The Supreme Court stated in *Fernandez* that New Mexico courts should follow the majority view and should "only find that arbitrators have exceeded their powers when the arbitrators rule on a matter that is beyond the scope of the arbitration agreement; inconsistent with the arbitration agreement; removed from their consideration by statute; or removed from their consideration by case law." *Fernandez*, 115 N.M. at 628, 857 P.2d at 28 (citations omitted). Consequently, it was proper for the district court to rely on *Fernandez* for guidance in determining whether the arbitrators exceeded their powers in the present case.

**{18}** We also decline to follow the authority from other jurisdictions that the State relies on in arguing that the district court should have conducted an independent review of the arbitration records. As demonstrated above, New Mexico appellate decisions have addressed the standard of review applicable to Section 44-7A-24(a) challenges to an arbitrator's decision, and we therefore see no reason to look for guidance from other jurisdictions. *See Fernandez*, 115 N.M. at 628, 857 P.2d at 28 (holding that an arbitrator's error of law did not equate to the arbitrator having exceeded his power); *see also In re Town of Silver City*, 115 N.M. at 632, 857 P.2d at 32 (involving an argument that an arbitrator exceeded his power by applying an incorrect standard of law); *Nat'l Union of Hosp. Emps. v. Bd. of Regents*, 2010-NMCA-102, ¶¶ 31-32, 149 N.M. 107, 245 P.3d 51 (involving a request to vacate an award on the ground that the arbitrator exceeded his powers by conducting a final-offer arbitration that was contrary to a hospital labor resolution and the PEBA); *K.R. Swerdfeger Constr., Inc. v. Bd. of Regents*, 2006-NMCA-117, ¶¶ 1, 18-19, 140 N.M. 374, 142 P.3d 962 (involving a contractor who argued that the arbitrator exceeded his powers because the award violated public policy).

## II.     Our Standard of Review

**{19}** On appeal, we review a district court's confirmation of an arbitration award to determine whether substantial evidence in the record supports the district court's findings of fact and whether the district court correctly applied the law to the facts when making its conclusions of law. *Casias v. Dairyland Ins. Co.*, 1999-NMCA-046, ¶ 8, 126 N.M. 772, 975 P.2d 385. Therefore, in this case, we review the district court's conclusion that the arbitrators did not exceed their powers and determine whether that conclusion flows from sufficiently supported facts and whether it is a correct application of the UAA's requirements.

## III.     Whether the Arbitrators Exceeded Their Powers

**{20}** We next address whether the district court erred in determining that the arbitrators did not exceed their powers under Section 44-7A-24(a)(4). As noted above, an arbitrator is

considered to have exceeded his/her powers when the arbitrator rules on a matter that is beyond the scope of the arbitration agreement, inconsistent with the arbitration agreement, or removed from the arbitrator's consideration by statute or by case law. *Fernandez*, 115 N.M. at 628, 857 P.2d at 28. In this case, the State contends that the arbitrators exceeded their powers (1) by determining that the Legislature had appropriated sufficient funds to cover the salary increases mandated by the Agreements and (2) by entering awards that violate provisions of the New Mexico Constitution as well as (3) Section 10-7E-17(E) of the PEBA. We address each of these arguments in turn.

## A. The Arbitrators Did Not Exceed Their Powers in Finding That the Legislature Appropriated Sufficient Funds to Cover the Salary Increases

{21} The State argues that the arbitrators exceeded their powers and committed gross error in finding that the Legislature appropriated sufficient funds to cover both salary increases required by the Agreements. The State challenges the arbitrators' legal and factual findings concerning the language of the two legislative appropriation bills, House Bill 2 (HB2) and Senate Bill 165 (SB165), from the 2008 legislative session. Specifically, the State argues that the arbitrators erroneously interpreted the phrase "average salary increase" in the bills and that the arbitrators made faulty calculations in determining whether the legislative appropriations were sufficient to fund the two salary increases.

{22} We view the State's arguments as an attempt to have this Court review de novo the arbitrators' determinations. We decline to do so. The UAA does not permit de novo review of the merits of the arbitrations at issue in this case. *In re Town of Silver City*, 115 N.M. at 632, 857 P.2d at 32 (emphasizing that the UAA "neither empowers the district court to review an arbitration award on the merits of the controversy, nor grants the district court the authority to review an award for errors of law or fact"). "Judicial reexamination of arbitrators' rulings on findings of fact and issues of law . . . prolong adversary proceedings, thereby frustrating the parties' goals of using [arbitration as] an expeditious and relatively inexpensive alternative to litigation." *Fernandez*, 115 N.M. at 626, 857 P.2d at 26. Consequently, judicial review of arbitration awards should avoid making an arbitration award "the commencement, not the end, of litigation." *Id.* (internal quotation marks and citation omitted).

{23} Our review of the record indicates that during the arbitration proceedings, the State considered the legal and factual issues it now raises on appeal to be within the scope of the arbitrators' decision-making authority. At the start of the arbitrations, the parties stipulated to a broad statement of issues, including whether the State had violated the Agreements by implementing the pay package for FY2009 and, if so, what remedy was appropriate. During both arbitrations, the State presented testimony concerning its interpretation of the two legislative bills and, specifically, how it interpreted the language "average salary increase" in these bills. The parties also presented testimony and exhibits concerning the factual issue of whether the funds appropriated by the Legislature were sufficient to cover the salary increases required by the Agreements. Either expressly or impliedly through its argument

8

before the arbitrators, the State considered these legal and factual issues to be within the scope of the arbitration. Accordingly, having agreed to submit these issues to the arbitrators, the State was bound by the arbitrators' legal and factual findings on these issues. *United Tech. & Res., Inc. v. Dar Al Islam*, 115 N.M. 1, 6, 846 P.2d 307, 312 (1993) ("Having bitten once at the arbitration apple, [the unsuccessful party] cannot now take a second bite from the judicial one."). "So long as the award is made fairly and honestly and is restricted to the scope of the submission, it must be confirmed by the district court." *Fernandez*, 115 N.M. at 627, 857 P.2d at 27.

**{24}** Thus, just as the district court lacked authority to review the merits of the issues arbitrated, we are also unable to reweigh the evidence and rule on the merits of the issues arbitrated. Even if the arbitrators committed legal or factual error, as the State claims on appeal, we see no permissible basis for reviewing the merits of the issues that were arbitrated. We reiterate that "[l]egal and factual mistakes, such as applying the wrong standard of proof, do not comprise an abuse of power" under Section 44-7A-24(a)(4). *See In re Town of Silver City*, 115 N.M. at 632, 857 P.2d at 32 (determining that an arbitrator did not exceed his power by applying the incorrect standard of proof); *see also Fernandez*, 115 N.M. at 625-26, 857 P.2d at 25-26 (determining that an arbitrator did not exceed his power in interpreting a statute concerning uninsured motorist benefits, even if the interpretation was arguably incorrect, because his actions were within the scope of the arbitration agreement and the award was fairly and honestly made); *K.R. Swerdfeger Constr.*, 2006-NMCA-117, ¶ 26 ("An arbitrator's incorrect interpretation of a statute is not sufficient to show that enforcement of the arbitration award would violate public policy.").

**B.      The Arbitrators Did Not Exceed Their Powers by Issuing Awards That the State Contends Require an Unconstitutional Retroactive Salary Increase**

**{25}** The State argues that the arbitrators acted in excess of their authority by issuing awards that allegedly require retroactive salary increases for the Unions' employees in violation of Article IV, Section 27 of the New Mexico Constitution. Article IV, Section 27 provides:

> No law shall be enacted giving any extra compensation to any public officer, servant, agent or contractor after services are rendered or contract made; nor shall the compensation of any officer be increased or diminished during his term of office, except as otherwise provided in this constitution.

The State maintains that the remedies provided in the arbitration awards constitute extra compensation for services already performed in violation of Article IV, Section 27.

**{26}** We reject the State's argument. As noted earlier, the arbitrators determined that sufficient funds were allocated by the Legislature to cover the salary increases required by the Agreements and, therefore, that the State violated its contractual obligations under the Agreements by failing to provide these salary increases in FY2009. Thus, the arbitrators'

9

chosen remedy was not payment for services already performed but, instead, payment that the Unions' employees were contractually entitled to at the time they performed their services and failed to receive due to the State's breach of its contractual obligations under valid and binding Agreements. Stated differently, the remedies mandated by the arbitrators were not "extra compensation" as used in Article IV, Section 27 for services performed in FY2009, but compensation that the Unions' employees were entitled to and would have received were it not for the State's violation of the Agreements. Moreover, the Unions' employees cannot be faulted for undertaking grievance and arbitration procedures that were resolved after the end of FY2009, which was the fiscal year during which the contractual salary increases were to take effect. We therefore conclude that the arbitration awards did not require an unconstitutional salary increase and that the arbitrators did not act in excess of their authority in this regard.

## C.  The Arbitrators Did Not Exceed Their Authority by Issuing Awards That Allegedly Violated Provisions of the PEBA

**{27}**   The State also argues that the arbitrators exceeded their powers by mandating monetary relief that will require the Legislature to appropriate funds. Emphasizing that the legislative appropriations at issue in this case were specifically limited to FY2009, the State contends that the funds are no longer available. Consequently, the State argues that the monetary relief included in the arbitration awards violates Section 10-7E-17(E) of the PEBA. In addition, the State asks that we apply the non-delegation doctrine to vacate the arbitration awards.

**{28}**   Section 10-7E-17 of PEBA covers the scope of bargaining between public employers and labor representatives. In relevant part, Subsection 17(E) provides that:

> E.    An impasse resolution or an agreement provision by the state and an exclusive representative that requires the expenditure of funds shall be contingent upon the specific appropriation of funds by the [L]egislature and the availability of funds. . . . *An arbitration decision shall not require the reappropriation of funds.*

(Emphasis added.)  The State argues that this provision prohibited the arbitrators from "requiring a reappropriation of funds from an already enacted budget." The Unions argue, however, that Section 10-7E-17 applies only to arbitrations following an impasse, which is defined under the PEBA as the "failure of a public employer and an exclusive representative, after good-faith bargaining, to reach agreement in the course of negotiating a collective bargaining agreement." Section 10-7E-4(K). The Unions contend that this appeal arises from grievances and arbitration proceedings filed after the parties had already negotiated and signed the Agreements; therefore, they claim that Subsection 17(F)—which does not contain an express reappropriation prohibition—is applicable here:

10

F.      An agreement shall include a grievance procedure to be used for the settlement of disputes pertaining to employment terms and conditions and related personnel matters. The grievance procedure shall provide for a final and binding determination. The final determination shall constitute an arbitration award within the meaning of the [UAA]; such award shall be subject to judicial review pursuant to the standard set forth in the [UAA]. The costs of an arbitration proceeding conducted pursuant to this subsection shall be shared equally by the parties.

Section 10-7E-17(F).

**{29}** We need not determine whether Subsections 17(E) or 17(F) applies to this case. The State's argument is premised on its contention that the arbitration awards would require further appropriation or a reappropriation of funds by the Legislature. However, the arbitrators determined that the Legislature already appropriated sufficient funds in FY2009 for the State to meet its contractual obligations under the Agreements and that the State failed to meet its contractual obligation to distribute the funds according to the terms of the Agreements. The State's representation that it has already used the funds appropriated by the FY2009 legislative appropriations should not affect the arbitrators' decisions and awards in favor of the Unions. There is no difference between this case and other cases where adverse judgments are rendered against the State; as in those cases, the State cannot avoid its obligation to comply with the judgment by maintaining that compliance would require it to seek further appropriations from the Legislature. *Cf. Salazar v. Ramah Navajo Chapter*, 567 U.S. ___, 2012 WL 2196799, at *7 (June 18, 2012) (explaining that "[o]nce 'Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue, the Government normally cannot back out of a promise to pay on grounds of 'insufficient appropriations,' even if the contract uses language such as 'subject to the availability of appropriations,' and even if an agency's total lump-sum appropriation is insufficient to pay *all* the contracts the agency has made'" (*quoting Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 637 (2005)) and that this rule "furthers the Government's own long-run interest as a reliable contracting partner in the myriad workaday transaction of its agencies." *Salazar*, 2012 WL 2196799, at *1 (internal quotation marks and citation omitted).

**{30}** At oral argument, the State raised a second argument based on Subsection 17(E) of the PEBA. The State contended that the term "agreement provision" in Subsection 17(E) means a collective bargaining agreement and, therefore, that the Agreements in this case were dependent upon the "specific appropriation" of funds by the Legislature required by that subsection. The State argued that the two legislative appropriation bills of relevance to this case were not specific enough to meet this requirement because they did not contain definitive language tying the appropriations to the Agreements.

**{31}** The term "agreement provision" is not defined in the statute and has not previously been interpreted by our appellate courts. Assuming without deciding that Subsection 17(E) applies to the Agreements in this case, we nonetheless conclude that the legislative

11

appropriations were specific enough to withstand scrutiny. HB 2, the Legislature's primary appropriations bill during the 2008 legislative session, included several provisions discussing appropriations for each state agency or department. The bill appropriated $12,833,000 "to provide incumbents in agencies governed by the Personnel Act . . . with an average salary increase of two and four-tenths percent based on employee job performance as determined by the personnel board" to be effective on July 1, 2008. This provision within the bill specified the effective date, the rate of the increase, and that it was an appropriation for all agencies covered by the Personnel Act. Though the percent of the increase and effective date varied from those specified in the Agreements, there is no question that this language in HB 2 included the Union-represented employees, a subset of "incumbents in agencies governed by the Personnel Act."

**{32}** We are not persuaded that the Legislature, in using the term "specific" in Subsection 17(E), intended for it to be applied in the manner that the State raises. It would be unrealistic to require the Legislature to specifically delineate within its appropriation bills all of the contractual salary obligations the State enters into with various entities, including unions. We therefore conclude that the arbitrators did not exceed their powers because the awards do not violate Subsection 17(E) of the PEBA.

## IV.    The Dissent's View

**{33}** We briefly address the arguments asserted in the Dissent. The Dissent contends that the UAA/*Fernandez* standard of review we employ in this Opinion is improper under the circumstances of this case for two primary reasons: (1) our Supreme Court in *Bd. of Educ. of Carlsbad Mun. Sch. v. Harrell*, 118 N.M. 470, 882 P.2d 511 (1994), requires broader judicial review under these circumstances, and (2) the PEBA itself requires a different standard of judicial review. The Dissent maintains that, under *Harrell*, the PEBA's directive in Section 10-7E-17(F) requiring application of the UAA's limited judicial review violates the doctrine of separation of powers and principles of due process. Because of these violations, the Dissent contends, the arbitration awards in this case are subject to more expansive judicial review than permitted by the UAA. The Dissent also maintains that the PEBA itself restricts an arbitrator to the interpretation of the four corners of the collective bargaining agreement and precludes interpretation of legislative bills.

**{34}** The problem with the Dissent's contentions is that the State never raised these issues or points in this Court, nor were they presented to the arbitrators or the district court. A necessary prerequisite to the Dissent's position based on *Harrell* is the determination that Section 10-7E-17(F) is unconstitutional. *See Harrell*, 118 N.M. at 473, 882 P.2d at 514 (holding that a provision of the State Personnel Act limiting judicial review in an appeal from a school board's decision to discharge a certified employee was unconstitutional). In their briefs in this Court, none of the parties cited *Harrell* or suggested that any part of the PEBA was constitutionally infirm. Nor did any of the parties argue that the PEBA precluded the arbitrators from interpreting the appropriation bills. In fact, both the State and the Unions asked the arbitrators to interpret the bills in question, and both presented evidence

12

to aid the arbitrators in their interpretation. On appeal, the State argues only that the arbitrators' interpretations were legally flawed, not that the interpretations were unauthorized.

**{35}** In our view, it would be unfair to the parties for us, sua sponte, to conceive of and articulate legal theories that never occurred to the parties and that were not raised in the proceedings below or on appeal. The State did not make the arguments crafted by the Dissent and, more importantly, the Unions have never had any opportunity to respond to these unstated arguments. Were we to decide this case as the Dissent suggests, the Unions would be justifiably dismayed that they have been denied the opportunity to present a different view of *Harrell* and the PEBA. Our Supreme Court has admonished that "[c]ourts risk overlooking important facts or legal considerations when they take it upon themselves to raise, argue, and decide legal questions overlooked by the lawyers who tailored the case to fit within their legal theories." *N.M. Dep't of Human Servs. v. Tapia*, 97 N.M. 632, 634, 642 P.2d 1091, 1093 (1982); *see State v. Werner*, 115 N.M. 131, 132, 848 P.2d 1, 2 (Ct. App. 1992) (explaining that appellate courts should not address arguments the parties have failed to brief unless "there could be no valid reason for the lower court's action" (internal quotation marks and citation omitted)), *rev'd on other grounds by* 117 N.M. 315, 871 P.2d 971 (1994).

**{36}** While the Dissent correctly observes that the standard of review is not subject to the usual preservation requirements, the Dissent's contentions cannot reasonably be characterized as a simple determination of the proper standard of review. Rather, for us to determine that we should apply something other than the UAA standard governing the judicial review of arbitration awards, we would first necessarily have to strike down Section 10-7E-17(F), which requires that any arbitration award "shall be subject to judicial review pursuant to the standard set forth in the [UAA]." *Id.* The only way to strike down that statute is to determine it to be unconstitutional, just as the Supreme Court in *Harrell* found a provision in the State Personnel Act to be unconstitutional in order to adopt a different standard of review. This is a proposition that is far more complex than the simple choice of a de novo or abuse of discretion standard of review.

**{37}** In addition, the question here is not one of preservation. We would be concerned with preservation if the State had made the Dissent's contentions on appeal and the Union had objected on the ground that the arguments were never made below. Here, the arguments were never made in this Court—at least not until the Dissent made them. We decline to create arguments that the parties themselves have not raised.

## CONCLUSION

**{38}** We affirm the district court's confirmation of both the AFSCME and the CWA arbitration awards.

**{39}** **IT IS SO ORDERED.**

_____

**CYNTHIA A. FRY, Judge**

**I CONCUR:**

_____

**JONATHAN B. SUTIN, Judge**

**J. MILES HANISEE, Judge (dissenting).**

**HANISEE, Judge (dissenting).**

**{40}**    At the heart of this case lie separate arbitral awards, each turning on a single legal question:  whether the 2008 Legislature, by its $12.8-million-dollar appropriation bills, intended to specifically fund the State's 2005 and 2006 collective bargaining Agreements and thereby trigger salary increases for AFSCME/CWA bargaining unit employees over and above those awarded to comparably situated, but unrepresented, classified public employees.  Both arbitrators interpreted the Legislature's stated intention to fund "an average salary increase of two and [nine]-tenths percent based on employee job performance as determined by the personnel board" as unambiguously funding the union contracts, and rejected evidence and argument presented to the contrary.  By affirming the district court's confirmation of both awards, the majority ratifies application of the Uniform Arbitration Act's (UAA's) built-in standard of review, which is "among the narrowest known to the law," permitting vacatur of an arbitral award only if tainted by corruption, fraud, misconduct, or the like.  *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 932, 936 (10th Cir. 2001) (internal quotation marks omitted).  Consequently, meaningful judicial review of the arbitrators' legally determinative fiscal constructions is evaded.  *See supra*, Majority Opinion ¶ 24 ("[W]e are also unable to . . . rule on the merits of the issues arbitrated[,] . . . [e]ven if the arbitrators committed legal or factual error[.]").  Because I believe that application of the UAA's standard of review to these arbitral awards contravenes direct precedent, the New Mexico Constitution, PEBA itself, and sound public policy, I respectfully dissent.

**Standard of Review**

**{41}**    This Court independently determines the standard of its review.  *Clayton v. Farmington City Council*, 120 N.M. 448, 453, 902 P.2d 1051, 1056 (Ct. App. 1995) ("[O]ne of our first tasks is to determine the standard of review we should apply in examining district court judgments.").  This is true even when the parties have failed to adequately present the issue below, or in this Court.  *Watson v. Town Council of Bernalillo*, 111 N.M. 374, 376, 805 P.2d 641, 643 (Ct. App. 1991); *see also State v. Barrera*, 2001-NMSC-014, ¶ 20, 130 N.M. 227, 22 P.3d 1177 ("The standard of review on appeal is an issue that is separate and distinct from the requirement of preservation.").  While the majority here precludes application of a standard of review not specifically advanced by the parties, *see supra*, Majority Opinion

¶¶ 34-37, my view is that our appellate obligation incorporates the identification and use of the standard that is correct as a matter of law.

**{42}** The majority cites the general standard appropriate to our review of a district court's confirmation of an arbitral award, which requires that factual findings be supported by substantial evidence and that applicable law be correctly utilized in relation to the facts. *See Casias*, 1999-NMCA-046, ¶ 8. But that "standard of review depends on the nature of the review undertaken by the district court[,]" *Clayton*, 120 N.M. at 453, 902 P.2d at 1056, which here reviewed the arbitral awards only as directed by the UAA. *See* § 44-7A-3(a) ("The [UAA] governs an agreement to arbitrate made on or after [July 1, 2001]."); *see also* § 10-7E-17(F) ("[D]isputes pertaining to employment terms and conditions and related personnel matters[,] . . . shall constitute an arbitration award . . . [and] be subject to judicial review pursuant to the standard set forth in the [UAA]."). Our New Mexico Supreme Court, however, has plainly required that a broader, administrative standard of review be applied when the parties have been *compelled* to arbitrate by statute. *Harrell*, 118 N.M. at 485-86, 882 P.2d at 526-27.

**{43}** *Harrell* distinguished voluntary arbitration from statutorily mandated arbitration and assigned differing standards of review to each. When arbitration is volitional, a "limited scope of judicial review of arbitration awards is appropriate [because] the parties have *voluntarily* bargained for the decision of an arbitrator and, presumably, have assumed the risks of and waived objections to that decision." *Id.* at 476, 882 P.2d at 517 (emphasis added). The Court explained, however, that "[w]hen arbitration is statutorily mandated as the sole method for resolution of a particular dispute, the arbitration is not consensual even if a provision for such arbitration is incorporated into a contract." *Id.*; *see also Rivera v. Am. Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 38, 150 N.M. 398, 259 P.3d 803 ("Arbitration is a matter of consent, not coercion[.]" (internal quotation marks and citation omitted)).

**{44}** While the New Mexico Supreme Court ultimately upheld the enforceability of statutorily mandated arbitration in *Harrell*, it declared unconstitutional the State Personnel Act's limited standard of review—which is directly analogous to that of the UAA—when applied to the challenged product of compulsory arbitration:

> [D]ue process, together with separation of powers considerations, requires that parties to statutorily mandated arbitration be offered meaningful review of the arbitrator's decision. In order for review of the arbitrator's decision to be meaningful, the court must determine whether the litigant received a fair hearing before an impartial tribunal, whether the decision is supported by substantial evidence, and whether the decision is in accordance with law. [Any] provision . . . limiting judicial review of the arbitrator's decision to cases "where the decision was procured by corruption, fraud, deception or collusion" does not permit meaningful review of the arbitrator's decision by the court. We therefore strike th[ese] provision[s] as a violation of due process and as an unconstitutional delegation of judicial power.

15

118 N.M. at 485, 882 P.2d at 526.

**{45}** Thus, the appropriate standard of district court review in this case turns on whether the arbitration herein was compulsory or voluntary. There has been one case in our jurisprudence to address this question in the context of PEBA, but for reasons explained below its result is distinguishable. *See generally Int'l Ass'n of Firefighters v. City of Carlsbad*, 2009-NMCA-097, ¶ 18, 147 N.M. 6, 216 P.3d 256. In *Int'l Ass'n of Firefighters*, this Court reasoned that the final arbitration provided for in Section 10-7E-18(B) of PEBA was voluntary, rather than compulsory, because the parties could have agreed to an alternative impasse procedure under Section 10-7E-18(C), and because the arbitrator's election to adopt the "complete, last, best offer" was contingent on the future discretion of the City in exercising its independent power to appropriate funds. 2009-NMCA-097, ¶¶ 7, 13, 18 (internal quotation marks and citation omitted).

**{46}** The provision of PEBA applicable to this case is very different from that analyzed in *Int'l Ass'n of Firefighters*. First, the grievance procedures contained within the 2005 and 2006 Agreements and invoked by the Unions were adopted pursuant to Section 10-7E-17(F), which *mandated* binding arbitration for resolution of disputes arising under the Agreements:

> An agreement *shall* include a grievance procedure to be used for the settlement of disputes pertaining to employment terms and conditions and related personnel matters. The grievance procedure *shall* provide for a final and binding determination. The final determination *shall* constitute an arbitration award within the meaning of the [UAA] . . . .

(Emphasis added.)

**{47}** Also, Section 10-7E-17 lacks a comparable opt-out provision such as that present in *Int'l Ass'n of Firefighters*, which would have allowed the parties to agree to a grievance procedure other than binding arbitration. And while the Agreements at issue are similarly "contingent upon the specific appropriation of funds by the [L]egislature and the availability of funds[,]" the arbitrators' decisions herein occurred as a product of past-funded legislative appropriations. Section 10-7E-17(E). In contrast, the City in *Int'l Ass'n of Firefighters* possessed the independent power to fund the terms adopted by that arbitrator's decision at some point in the future if it so chose. 2009-NMCA-097, ¶¶ 3, 12.

**{48}** Given these distinctions, it is my view that the mandatory arbitration clause provided in Section 10-7E-17(F) and exported into these Agreements, is compulsory under *Harrell*.

The terms of the Agreements requiring binding arbitration were non-negotiable.[1]  Thus, UAA review of these awards ran structurally afoul of our Supreme Court's careful effort to limit cursory judicial review following involuntary resolution of disputes by an arbitrator. Applying *Harrell*, I would declare the clause within PEBA's Section 10-7E-17(F) that limits "judicial review pursuant to the standard set forth in the Uniform Arbitration Act" to be unconstitutional.

**{49}**  Importantly, the applicability of our New Mexico Supreme Court's analysis goes beyond the simple determination of whether submission to an arbitrator's authority is a product of force or choice.  *Harrell* based its ultimate determination on separation of powers grounds in addition to due process, further rooting its decision within the New Mexico Constitution.  *See* 118 N.M. at 482, 882 P.2d at 523; N.M. Const. Art. III, § 1 ("The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as in this constitution otherwise expressly directed or permitted.").  Our Supreme Court stressed the critical role of the judiciary as a separate and independent power, vital to the proper operation of government:

> The judiciary thus must maintain the power of check over the exercise of judicial functions by quasi-judicial tribunals in order that those adjudications will not violate our constitution.  The principle of check requires that the essential attributes of judicial power, *vis-a-vis* other governmental branches and agencies, remain in the courts.

*Harrell*, 118 N.M. at 484, 882 P.2d at 525.  Seperately, our Supreme Court has upheld the Legislature's constitutional role in assigning the location at which the funds it chooses to disburse come to rest.  *State ex rel. Schwartz v. Johnson*, 120 N.M. 820, 825, 907 P.2d 1001, 1006 (1995) ("The [L]egislature must exercise its 'exclusive power of deciding how, when, and for what purpose the public funds shall be applied in carrying on the government.'" (citation omitted)).

**{50}**  In my view, the arbitrators' interpretations of the Legislature's intent to discharge its independent appropriative function ascend to a level of constitutional significance.  Each award is therefore subject to the judiciary's power of check, and not the virtual rubberstamp of UAA review.  Pursuant to *Harrell*, that check is provided by way of an administrative agency standard of review.  *See* 118 N.M. at 485-86, 882 P.2d at 526-27 ("The scope of review constitutionally required for compulsory arbitration is the review required for

---

[1] The State was separately compelled from the outset—again, by PEBA—to negotiate and reach agreements with the participatory bargaining units. *See* § 10-7E-17(A) (mandating that the State "shall bargain in good faith . . . [and] shall enter into written collective bargaining agreements covering employment relations").

17

administrative adjudications[,]" which entails "a determination whether the administrative decision is arbitrary, unlawful, unreasonable, capricious, or not based on substantial evidence."). Because the district court did not employ the appropriate standard of review to these arbitral awards, I would remand for it to do so.

**PEBA Limits Arbitrator Power**

**{51}** Further undermining the exclusive application of UAA-derived review to the question of law at issue is PEBA itself, which expressly limits arbitrator authority to matters of contractual interpretation within the four corners of a given collective bargaining agreement. Section 10-7E-17(F) (limiting grievance arbitration to "the settlement of disputes pertaining to *employment terms and conditions* and *related personnel matters*." (emphasis added)); *cf. Agreement Between The State of New Mexico and State Employee Alliance The Communications Workers of America AFL-CIO, CLC*, art. 9, §§ 1(A), 5 (Feb. 1, 2006) ("Allegations of violation, misapplication, or misinterpretation *of this Agreement* . . . shall be subject to this negotiated grievance procedure[,]" and "[t]he arbitrator shall have no power to add to, subtract from, alter, or modify any of the terms of the Agreement, but may give appropriate interpretation or application *to such terms* and provide appropriate relief." (emphasis added)). Thus, PEBA too supports the diminution of an arbitrator's might to questions of law that are answerable only beyond the confines of collective bargaining agreements.

**{52}** To implement this distinction, PEBA defines two tracks for resolution of disputes arising between the State and bargaining units: (1) administrative agency proceedings before the Public Employee Labor Relations Board (the Board) and (2) binding arbitration. Board rulings are subject to a typical administrative agency standard of review, reversible only when found to be "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence on the record considered as a whole; or (3) otherwise not in accordance with law." Section 10-7E-23. The contrasting standard of review for arbitral awards is the far narrower UAA provision within Section 44-7A-24(a): vacatable only for "fraud, partiality, misconduct, excess of powers, or technical problems in the execution of the award."[2] *Fernandez*, 115 N.M. at 625, 857 P.2d at 25. Like the dichotomy in *Harrell* that separates these same standards of review based upon voluntariness or compulsion, PEBA differentiates between disputes that are intrinsic to or extrinsic from the Agreement at issue.

**{53}** The limitation of an arbitrator's reach is expressed by the referral of intrinsic disputes for arbitration, while legally broader extrinsic matters are resolved by the Board PEBA

---

[2] Arguably, even under UAA review, these arbitral awards require vacatur because they are products of the extrinsic interpretation of legislative appropriation, an area of inquiry that exceeds an arbitrator's power pursuant to PEBA. The majority, however, does not address that question based upon its conclusion that the State failed to preserve the argument with a requisite level of specificity. *See supra*, Majority Opinion ¶ 23.

created.  *See* §§ 10-7E-8, -9 (providing that Board powers and duties include "the filing of, hearing on and determination of complaints of prohibited practices").  Prohibited practices complaints are defined at Section 10-7E-19, and include complaints relating to the failure "to comply with a collective bargaining agreement."  Section 10-7E-19(H).  Additionally, PEBA directs that "[t]he board shall promulgate rules necessary to accomplish and perform its functions and duties."  Section 10-7E-9(A).  One of the regulations promulgated by the Board expresses the same effort to define an arbitrator's power in a manner that expresses its outer boundaries:

> If the subject matter of a prohibited practices complaint requires *the interpretation of a collective bargaining agreement*; and the parties waive in writing any objections to timeliness or other procedural impediments to the processing of a grievance, and the director determines that the resolution of the *contractual dispute* likely will resolve the issues raised in the prohibited practices complaint, then the director may, on the motion of any party, defer further processing of the complaint until the grievance procedure has been exhausted and an arbitrator's award has been issued.

11.21.3.22(A) NMAC (02/28/2005) (emphasis added)[3]; *accord* S. Barry Paisner & Michelle R. Haubert-Barela, *Correcting the Imbalance:  The New Mexico Public Employee Bargaining Act and the Statutory Right Provided to Public Employees*, 37 N.M. L. Rev. 357, 373 (2007) (noting that under the Civil Service Reform Act a more rigorous review process applies to unfair labor practices, whereas an arbitrator's "interpretation of the collective bargaining agreement . . . remains largely unreviewable").

**{54}**  The proper confinement of an arbitrator's power to the contracts which create it also enjoys broad historical support.  The United States Supreme Court, for instance, has recognized that:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement . . . .  Thus the arbitrator has authority to resolve only questions of contractual rights . . . .  [T]he specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land. . . . [T]he resolution of statutory or constitutional issues is a primary responsibility of courts . . . ."

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 53-57 (1974) (first alteration in original) (internal quotation marks and citations omitted).  Thus, pursuant to the language contained within the Agreements and PEBA itself, judicial review is required as to whether these

---

[3] Also arguably, the nature of the Union's grievance—which began as a prohibited practices complaint charging that the State failed to comply with the Agreements—was unsuited for deferral to arbitration and instead required resolution by the Board.

arbitrators erred as a matter of law, and not simply whether they exceeded their powers or were corrupt.

**Public Policy**

**{55}** Lastly, under the UAA the decision of an arbitrator cannot be vacated for legal error *or* contravention of public policy. *See Fernandez*, 115 N.M. at 627-28, 857 P.2d at 27-28 (noting that arbitral awards are not reviewable for legal error); *see also K.R. Swerdfeger Constr.*, 2006-NMCA-117, ¶ 19 ("[We are] not convinced . . . that anything in the UAA permits a court to vacate an arbitration award on public policy grounds."). Accordingly, today's Opinion also leaves unanswered the question of whether the discrepant entitlement of select classified employees to participate in non-commensurate wage increases comports with New Mexico public policy.

**{56}** Pursuant to the Agreements, employees within the represented bargaining units were each entitled to claim both a two percent general salary increase, as well as a within-band increase of a compa-ratio-determined amount between one percent and three and one-half percent, each contingent upon funding. When added together, these increases meant that a represented employee's combined anticipated raise ranged from three percent to five and one-half percent. Unrepresented employees within parallel occupational classifications, but who were not included within AFSCME or CWA's bargaining units, stood to gain *no* increase pursuant to the Agreements. *See contra* § 10-7E-2 ("The purpose of [PEBA] is to . . . promote harmonious and cooperative relationships between public employers and public employees and to protect the public interest . . . ."). Today's ruling affirms that the State is bound by its 2005 and 2006 Agreements, thereby setting aside the State's effectuation of the 2008 legislative appropriations to provide a two and nine-tenths percent, across-the-board salary increase for *all* eligible state employees—union represented or not.

**{57}** It appears to me to be contrary to public policy for eligible state employees to be awarded substantially differing income increases for the performance of parallel public services, when that determination is based upon union representation and not upon merit. *See State v. Pub. Safety Emps. Ass'n*, 798 P.2d 1281, 1286 (Alaska 1990) ("[T]he merit system and the principle of like pay for like work are fundamental to public employment."). The result this Court reaches today prevents us from discharging our constitutional duty to determine whether the inequitable impact of the Agreements comports with the even-handedness with which New Mexico citizens expect state government to treat and compensate public employees who perform state business on a day-to-day basis. *See Hartford Ins. Co. v. Cline*, 2006-NMSC-033, ¶ 8, 140 N.M. 16, 139 P.3d 176 ("The predominant voice behind the declaration of public policy of the state must come from the [L]egislature, with an additional supporting role played by the courts and the executive department . . . ."). Had the district court applied the administrative standard of review required by *Harrell* and established within PEBA, this would not be the case.

**{58}** Because I cannot agree with the manner in which the majority resolves the issues in this appeal, I respectfully dissent.

_____

**J. MILES HANISEE, Judge**

**Topic Index for** _State v. Am. Fed. of State, Co., & Mun. Empl. Council 18_**, No. 30,847**

**APPEAL AND ERROR**
Preservation of Issues for Appeal
Standard of Review

**CIVIL PROCEDURE**
Arbitration

**COMMERCIAL LAW**
Uniform Arbitration Act

**CONSTITUTIONAL LAW**
New Mexico Constitution, General

**EMPLOYMENT LAW**
Collective Bargaining
Compensation and Commissions
Employment Contract
Labor Unions

**GOVERNMENT**
Public Employees

**REMEDIES**
Arbitration

**STATUTES**
Legislative Intent